UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ACA COMPUTER INTEGRATORS, INC., | ) ) ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION ) NO. 10-11926-JGD |
| CUBIC TRANSPORTATION SYSTEMS, INC., | ) ) ) |
| Defendant. | ) |

# MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

March 28, 2012

DEIN, U.S.M.J.

## I. INTRODUCTION

The defendant, Cubic Transportation Systems, Inc. ("Cubic"), is a party to a contract with the Massachusetts Bay Transportation Authority ("MBTA"), pursuant to which Cubic issues CharlieCards and CharlieTickets to MBTA customers and provides related services. In order to fulfill its contract with the MBTA, Cubic was also party to a separate subcontract with the plaintiff, ACA Computer Integrators, Inc. ("ACA"), a Disadvantaged Business Enterprise ("DBE"), pursuant to which ACA provided technical maintenance services concerning the CharlieCards and CharlieTickets systems. The subcontract with ACA assisted Cubic in meeting its goal of 12% DBE participation, as provided for in Cubic's contract with the MBTA.

On April 6, 2010, in compliance with the notice requirements of the subcontract, Cubic notified ACA that its subcontract would not be renewed. Instead, Cubic replaced ACA with another DBE, which performed ACA's work and additional work. In response, ACA brought this action, alleging that Cubic breached its contract with the MBTA, and breached the warranty of good faith and fair dealing implied in Cubic's contract with the MBTA, by failing to renew ACA's contract.[1] There is no contention that Cubic violated its subcontract with ACA.

The matter is presently before the court on the "Defendant Cubic Transportation Systems, Inc.'s Motion for Summary Judgment." (Docket No. 17). Cubic contends that it is entitled to summary judgment because ACA cannot establish that it was an intended third-party beneficiary of the contract between Cubic and the MBTA, or that Cubic's conduct in refusing to renew its subcontract with ACA constituted a breach of that agreement. As detailed herein, this court finds that the undisputed facts and circumstances concerning the contract between the MBTA and the defendant demonstrate that ACA was not an intended beneficiary of that agreement. Therefore, and for all the reasons detailed below, Cubic's motion for summary judgment is ALLOWED.

---

[1] These contract-based claims are the only claims remaining. ACA voluntarily withdrew its claim for fraud and, on March 17, 2011, this court dismissed ACA's claim that Cubic violated Mass. Gen. Laws ch. 93A. (Docket No. 16).

## II. STATEMENT OF FACTS[2]

The following facts are undisputed unless otherwise indicated.

In May 2007, the MBTA entered into a contract ("Contract") with ERG Transit Systems ("ERG"), under which ERG agreed to provide services necessary to process and fulfill orders from MBTA customers for electronic fare media cards known as "CharlieCards" and "CharlieTickets." (DF ¶ 1; Def. Ex. A at Recitals and ¶ 1). ERG and the MBTA agreed that the Contract would remain in effect for three years beginning on June 1, 2007, with three successive options to extend the term, upon mutual agreement by the parties, for additional one year periods. (Def. Ex. A. ¶ 1). In 2009, ERG assigned its rights under the Contract to Cubic. (DF ¶ 4).

The plaintiff, ACA, has never been a party to the Contract. (DF ¶ 6). Rather, in 2007, ERG entered into a separate subcontract ("Subcontract") with ACA under which ACA agreed to provide technical maintenance services to the CharlieCards and CharlieTickets systems. (DF ¶ 2). As detailed below, ACA continued to perform work under the Subcontract after the Contract was assigned to Cubic in 2009. However, in April 2010, Cubic notified ACA that it would not be renewing the Subcontract.

---

[2] The facts are derived from: (1) Cubic's Statement of Undisputed Facts, which is set forth on pages 3 through 6 of its Memorandum in Support of Motion for Summary Judgment (Docket No. 17-1) ("DF"); (2) the exhibits attached to the Declaration of Sterrett Brandt (Docket No. 17-2) and attached to Cubic's Reply Memorandum in Support of Motion for Summary Judgment (Docket No. 24) ("Def. Ex. __"); (3) the plaintiff's statement of Disputed Material Facts set forth on pages 4 through 8 of the plaintiff's Objection and Opposition to Defendant's Motion for Summary Judgment (Docket No. 22) ("PF at p. __"); and (4) the exhibits attached to the plaintiff's Objection and Opposition to Defendant's Motion for Summary Judgment (Docket No. 22) ("Pl. Ex. __").

In this action, ACA is not alleging that Cubic breached any of its obligations under the Subcontract. (DF ¶ 19). Instead, ACA claims that it was an intended beneficiary of the Contract between Cubic and the MBTA, and that Cubic's refusal to renew the Subcontract in 2010 constituted a breach of Cubic's obligations under its Contract.

### Details Regarding the Contract Between ERG and the MBTA

Pursuant to the Contract between ERG and the MBTA, ERG was authorized to "engage subcontractors to perform services pursuant to this Agreement" as long as certain conditions were met, including that the MBTA receive prior written notice of ERG's intent to hire a subcontractor, and that the MBTA have the right to reasonably withhold its consent to the engagement. (DF ¶ 12; Def. Ex. A ¶ 19.2). It further provided in relevant part that "[i]f the MBTA consents to the use of a subcontractor, then . . . [ERG] remains obligated under this Agreement for the performance of the subcontracted services, notwithstanding the MBTA's consent to the use of a subcontractor," and that "the MBTA has no obligations to the subcontractor and the subcontractor has no rights or remedies against the MBTA[.]" (DF ¶ 13; Def. Ex. A ¶ 19.2.1). Thus, ERG remained responsible for the performance of services that it delegated to subcontractors such as ACA, and such subcontractors acquired no rights against the MBTA by virtue of their agreements with ERG.

It is undisputed that ACA has been certified by the Massachusetts State Office of Minority and Women Business Assistance ("SOMWBA") as a DBE, and that ERG had a goal of at least 12% DBE participation in connection with its work under the Contract.

(DF ¶ 3; Def. Ex. B at 2-3, 7). Thus, the Contract specifically provided in relevant part as follows with respect to the use of DBEs on the MBTA project:

> **23.1.5  Disadvantaged Business Enterprise**
>
> [ERG] shall cooperate with the MBTA in implementing this Agreement obligations concerning Disadvantaged Business Enterprise ("**DBE**") utilization in this Agreement. [ERG] shall also cooperate with the MBTA and the federal government in reviewing [ERG's] activities relating to this Provision. This Provision is in addition to all other equal opportunity employment requirements of this Agreement. The MBTA shall make all determinations of compliance or non-compliance with the requirements of this Provision and the appropriate consequences of non-compliance . . . .
>
> **Stated Goal**
>
> The "stated goal" is those elements of work under this Agreement performed by qualified Disadvantaged Business Enterprises for amounts totaling not less than **12%** of the Agreement price.

(Def. Ex. A ¶ 23.1.5; see also DF ¶ 7; PF at p. 7).

The 12% DBE participation goal was consistent with the policy of the MBTA, and with regulations promulgated by the United States Department of Transportation ("DOT"), which were aimed at providing DBEs with equal opportunities to participate in DOT-assisted agreements. (See Def. Ex. E ¶ 1.1; PF at pp. 4-5). As set forth in the MBTA's Request for Proposals for the CharlieCards and CharlieTickets project, the MBTA's policy aimed to accomplish the following objectives:

> 1.1.1. Ensure nondiscrimination in the award and administration of DOT-assisted agreements;
>
> 1.1.2. Create a level playing field on which DBEs can compete fairly for DOT-assisted agreements;

> 1.1.3. Ensure that the DBE program is narrowly tailored in accordance with applicable law;
>
> 1.1.4. Ensure that only firms that fully meet 49 CFR Part 26 eligibility standards are permitted to participate as DBE's;
>
> 1.1.5. Help remove barriers to the participation of DBE's in DOT assisted agreements; and
>
> 1.16. Assist in the development of firms that can compete successfully in the marketplace outside the DBE program.

(Id.; see also 49 C.F.R. § 26.1).

The Contract specified that the MBTA would only accept DBEs which had been certified by one of four methods, including through the SOMWBA. Consequently, ACA, which had been certified through SOMWBA, was qualified to perform work in connection with the Contract, and was eligible to benefit from the MBTA's DBE policy and from the 12% DBE participation goal. (See DF ¶ 8; Def. Ex. A ¶ 23.1.5). However, nothing in the Contract's DBE provisions required ERG to engage a particular DBE or DBEs in order to achieve that goal. (See Def. Ex. A ¶ 23.1.5).

The DBE provisions contained in the Contract incorporated as Schedule 23.1.5 certain DBE-related documents that ERG had submitted to the MBTA in connection with its bid to perform work under the Contract. (Def. Ex. A ¶ 23.1.5; Def. Ex. B; PF at p. 7). The forms contained in Schedule 23.1.5 reflect the fact that ERG had contacted five DBEs regarding the Contract, and had selected ACA as the DBE subcontractor that it proposed to use to reach the 12% DBE participation threshold. (See Def. Ex. B at 3, 8, 11). How-

ever, nothing in the bid documents attached to the Contract indicate that ERG was precluded from selecting an alternative DBE. To the contrary, the MBTA's Request for Proposals for the project indicated that changes or substitutions of DBE firms identified in the bid submissions could be made, subject to the MBTA's review and written approval. (Def. Ex. E ¶ 1.5.3).

Pursuant to the Contract, the MBTA alone was to "make all determinations of compliance or non-compliance with the requirements of [the DBE] Provision and the appropriate consequences of non-compliance." (Def. Ex. A ¶ 23.15). Accordingly, the MBTA was responsible for monitoring ERG's compliance with the DBE requirements, and ERG was required to "submit and update quarterly reports summarizing the total DBE value for this Agreement." (DF ¶ 9; Def. Ex. A ¶ 23.1.5). Moreover, the Contract provided that, "[i]f at any time the MBTA has reason to believe that [ERG] is in violation of its obligations under [the DBE] Provision, or has otherwise failed to comply with [the DBE] Provision, the MBTA may, in addition to pursuing any other available legal remedy, commence proceedings, which may include sanctions." (DF ¶ 10; Def. Ex. A ¶ 23.1.5). There is no evidence in the record that the MBTA objected to the decision not to renew ACA's Subcontract.

The Contract also contained a number of representations and warranties. Significantly, ERG warranted that "[it] has not and will not take any actions that: (i) create, or purport to create, any obligation on behalf of the MBTA, or (ii) grant, or purport to grant, any rights or immunities to any third party under the MBTA's intellectual property or

proprietary rights." (DF ¶ 14; Def. Ex. A ¶ 27.1.7). The MBTA likewise warranted that "the MBTA has not and will not take any actions that: (i) create, or purport to create, any obligation on behalf of [ERG], or (ii) grant, or purport to grant, any rights or immunities to any third party under [ERG's] intellectual property or proprietary rights." (DF ¶ 15; Def. Ex. A ¶ 27.2.2).

The Contract further provided that it would be governed by Massachusetts law, and that exclusive jurisdiction would lie in the State or Federal Courts of Massachusetts. (DF ¶ 17; Def. Ex. A ¶ 31.1). Additionally, the Contract contained an integration clause, which provided that

> [t]his Agreement, including the exhibits attached hereto, sets forth the entire understanding and agreement of the Parties and supersedes any and all oral or written agreements or understandings between the Parties as to the subject matter of this Agreement. It may be changed only by a writing signed by both Parties. Neither Party is relying upon any warranties, representations, assurances or inducements not expressly set forth herein.

(PF at p. 8; Def. Ex. A ¶ 31.13). The term "Parties" is specifically defined in the Contract to mean ERG and the MBTA. (Def. Ex. A ¶ 22.23).

### Cubic's Decision Not to Renew the Subcontract with ACA

In 2009, ERG assigned its rights and obligations under the Contract to Cubic. (DF ¶ 4). Thereafter, ACA continued to perform technical maintenance services for the CharlieCards and CharlieTickets systems pursuant to the Subcontract. (DF ¶ 5). However, on April 6, 2010, Cubic notified ACA that it would not be renewing the Subcontract. (DF ¶ 18). This notice was in conformity with the contract terms governing non-renewal,

and ACA does not contend that Cubic breached the Subcontract by the manner in which it did not renew ACA's Subcontract.

Joseph Kelley, the MBTA manager responsible for administering the Contract, was told by ACA that it was being replaced moments before an MBTA Board of Directors meeting on April 7, 2010 held to determine if the MBTA should renew Cubic's Contract. (Kelley Dep. (Def. Ex. F) at 30-32). At the meeting, Kelley reported on the status of the Contract, including who were the current DBEs, and what percentage Cubic had obtained of its DBE goal. (Id. at 28-29, 43-46). Kelley did not mention that ACA was being replaced because it was not relevant to the decision whether to renew Cubic's Contract; rather, the concern was whether the Contract was being performed and whether Cubic was meeting its DBE goal. (Id. at 27-29, 31-32, 43-45). There is no evidence in the record that anything was done at the meeting which would have required Cubic to continue to use ACA as a subcontractor on the project.

In a letter dated May 12, 2010, Cubic formally notified the MBTA that it had selected a different DBE, RL Controls, to continue the work that ACA had been performing on the MBTA project and perhaps take on additional work. While Cubic questioned whether the MBTA's consent was needed for the non-renewal, it nevertheless provided information about RL Controls. (Def. Ex. C at 2). On May 17, 2012, the MBTA confirmed that its DBE compliance officer had received Cubic's letter, and informed Cubic that the compliance officer "has cleared the replacement" of ACA with RL

Controls. (DF ¶ 22; Def. Ex. D). Accordingly, it is undisputed that the MBTA approved Cubic's decision to end its engagement of ACA. (Def. Ex. F at 63-64).

Additional factual details relevant to this court's analysis are provided below where appropriate.

### III. ANALYSIS

#### A. Summary Judgment Standard of Review

Summary judgment is appropriate when the moving party shows, based on the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994). Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts

showing that there is a genuine issue for trial. Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)). The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. See Vineberg, 548 F.3d at 56. "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

### B. Count I: Claim for Breach of Contract

In Count I of its complaint, ACA claims that Cubic breached its Contract with the MBTA by failing to renew its Subcontract with the plaintiff, and "[b]y engaging in intentional misrepresentation to the MBTA about plaintiff's participation as a DBE subcontractor[.]" (Compl. (Docket No. 1) ¶¶ 27-33). As an initial matter, there is no evidence that Kelley, or anyone acting on Cubic's behalf, made any misrepresentation to the MBTA concerning ACA's participation as a subcontractor, and it is undisputed that the MBTA approved the non-renewal of ACA and its replacement by RL Controls. Moreover, ACA's claim for breach of contract must fail because it has no rights under the MBTA\Cubic Contract. Because ACA was not a party to the Contract between Cubic and the MBTA, it "must be a third-party beneficiary to recover under the [C]ontract. To recover as a third-party beneficiary, [ACA] must show that it was an *intended* beneficiary and not merely incidental." Rymes Heating Oils v. Springfield Terminal Ry., 265 F.

Supp. 2d 147, 151 (D. Mass. 2003) (internal quotations omitted), aff'd, 358 F.3d 82 (1st Cir. 2004). For the reasons that follow, this court concludes that ACA cannot make the requisite showing based on the undisputed facts in the record. Therefore, Cubic is entitled to summary judgment with respect to the breach of contract claim.

"An intended third-party beneficiary is one to whom the contracting parties intended to give the benefit of the promised performance." Id. However, the fact that a party "derive[s] a benefit from a contract between others does not make [that party an] intended third-party beneficiar[y] and does not give [it] the right to enforce that agreement." Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 464, 918 N.E.2d 36, 42 (2009). Rather, "[u]nder Massachusetts law, a contract does not confer third-party beneficiary status unless the 'language and circumstances of the contract' show that the parties to the contract 'clear[ly] and definite[ly]' intended the beneficiary to benefit from the promised performance." Id. at 466, 918 N.E.2d at 44 (quoting Anderson v. Fox Hill Vill. Homeowners Corp., 424 Mass. 365, 366-67, 676 N.E.2d 821 (1997)) (alterations in original). In the instant case, the undisputed facts concerning the language and circumstances of the Contract at issue demonstrate that the parties to that agreement had no intention of conferring third-party rights upon ACA.

It is clear from the language and circumstances of the Contract that the purpose of the DBE provisions was to satisfy the DOT's and the MBTA's policy of providing DBEs with opportunities to participate in DOT-assisted projects, and not to confer on such parties a right to enforce the Contract. The Contract expressly provided that the MBTA

would have no obligations to any subcontractors engaged by the general contractor, and that any such subcontractors would have "no rights or remedies against the MBTA[.]" (DF ¶ 13; Def. Ex. A ¶ 19.2.1). Furthermore, both the MBTA and ERG warranted that they had not and would not take any actions that would "create, or purport to create, any obligation on behalf of the [other]." (DF ¶¶ 14,15; Def. Ex. A ¶¶ 27.1.7, 27.2.2). Rather than manifesting an intent to bestow third-party rights upon ACA, or any other DBE, the parties to the Contract expressed a clear intent to preclude third-party claims. Under such circumstances, ACA cannot be considered an intended beneficiary of the Contract under Massachusetts law. See Lakew v. Mass. Bay Transp. Auth., 65 Mass. App. Ct. 794, 799, 844 N.E.2d 263, 267-68 (2006) (finding that plaintiff was not an intended third-party beneficiary where contractual arrangement anticipated the interests of third-parties, but purpose was "not to confer on such parties a right to enforce the contract"); Volpe Constr. Co., Inc. v. First Nat'l Bank of Boston, 30 Mass. App. Ct. 249, 256-57, 567 N.E.2d 1244, 1249 (1991) ("if two contracting parties expressly provide that some third party who will be benefited by performance shall have no legally enforceable right, the courts should effectuate the expressed intent by denying the third party any direct remedy." (Quotations and citation omitted)).

The language and circumstances of the Contract relating specifically to the use of DBEs also demonstrate that the contracting parties were concerned with meeting the 12% DBE participation goal and not with conferring benefits, much less third party rights, upon any DBE in particular. For example, but without limitation, the Contract required ERG to

assist the MBTA in implementing "obligations concerning [DBE] utilization[,]" and established a specific goal for the work to be performed "by qualified [DBEs.]" (Def. Ex. A ¶ 23.1.5). It also provided that the MBTA would accept DBEs which were certified by one of four different methods, and that ERG was responsible for submitting "quarterly reports summarizing the total DBE value for this Agreement." (Id.). However, nothing in the DBE provisions or in the bid documents attached to the Contract required ERG or Cubic to engage ACA, rather than an alternative DBE, as a subcontractor to perform work required under the Contract. Thus, there was "no 'clear and definite' intent embodied in the [Contract] to benefit [ACA], as Massachusetts law requires." Rymes Heating Oils, 265 F. Supp. 2d at 151.

The plaintiff argues that the evidence shows that "ERG relied very heavily on the experience and background of ACA and intended that ACA would benefit from the MBTA/ERG relationship." (Pl. Opp. Mem. (Docket No. 22) at 7). In particular, ACA points out that under the Contract, ERG was "bound by the forms submitted during the bid process," including the forms in which ERG made a "representation to the MBTA that [ERG] intended to hire ACA." (Pl. Opp. Mem. (Docket No. 22) at 7). While the Contract language does bind the contractor to the forms submitted during the bid process, including a Letter of Intent in which ERG represented that it would be using ACA to perform work on the project (see Def. Ex. B at 8), it is clear from the bid documents that ERG, and later Cubic, was not precluded from terminating ACA's engagement and substituting ACA for another DBE. As noted above, the MBTA's Request for Proposals for the project

-14-

acknowledged that the DBE firms could be changed, subject to the MBTA's review and written approval. (Def. Ex. E ¶ 1.5.3.). The MBTA also recognized that DBE subcontractors could be terminated during the course of the Contract, and obligated the contractor to make "good faith efforts to find another DBE subcontractor to substitute for the original DBE and immediately notify the MBTA in writing of its efforts to replace the original DBE." (Id. ¶1.8.). Accordingly, the circumstances of the Contract demonstrate that the contracting parties had no intention of binding ERG, and later Cubic, to its selection of ACA as its DBE subcontractor.

ACA argues in support of its contention that it is an intended third party beneficiary that during the deposition of the MBTA manager, Joseph Kelley, Kelley agreed that the MBTA's DBE program benefits both the MBTA and the DBE. (Pl. Opp. Mem. at 6). To the extent such testimony is relevant, it does not alter this court's determination that ACA was not an intended third-party beneficiary of the Contract. As described above, the fact that a third-party "derive[s] a benefit from a contract between others does not make [it an] intended third-party beneficiar[y] and does not give [it] the right to enforce that agreement." Cumis Ins. Soc'y, Inc., 455 Mass. at 464, 918 N.E.2d at 42. Furthermore, during his deposition, Kelley testified that the Contract required Cubic to comply with the 12% DBE participation goal, but it did not impose any obligation upon Cubic to use ACA as its DBE subcontractor. (See Def. Ex. F at 36-37). Therefore, Kelley's testimony provides further support for the conclusion that ACA was an incidental rather than an intended beneficiary.

The plaintiff nevertheless points to the fact that Kelley mentioned ACA to the MBTA Board during the April 7, 2010 meeting as evidence that Cubic was bound to use ACA under the Contract. However, there is no indication that anything said at the Board meeting modified the Contract terms, which precluded a third party from obtaining any rights vis-à-vis the MBTA. Moreover, there is no record support for ACA's argument that the Board relied on the selection of ACA as a subcontractor. Rather, Kelley testified that to the extent ACA was mentioned it was just to identify it as the current DBE, and further that the Board was "approving [Cubic], but not any of their particular subcontractors." (See Def. Ex. F at 29, 46). These facts, and the fact that the MBTA subsequently affirmed the replacement of ACA with RL Controls, establish that ACA was not an intended third-party beneficiary under the Contract between Cubic and the MBTA. Consequently, the plaintiff cannot prevail on its breach of contract claim, and, therefore, the defendant is entitled to summary judgment with respect to Count I of the complaint.[3]

### C.  Count II: Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count II of its complaint, ACA alleges that "[b]y intentionally misrepresenting the participation of ACA as a DBE subcontractor in its contract renewal with the MBTA and, concurrently, firing Plaintiff without disclosure to the MBTA Defendant unfairly

---

[3] Because ACA's breach of contract claim is premised on its status as an intended third-party beneficiary, and this court has determined that no such status existed, it is not necessary to consider Cubic's argument that "[e]ven if the Court were to assume ... that ACA was an intended third party beneficiary of the Contract, which it was not, ACA would still not be able to establish that Cubic committed a breach." (Def. Mem. at 12).

frustrated ACA from the benefit of its inclusion as an intended third party beneficiary to the Cubic-MBTA contract[.]" (Compl. ¶ 35). The plaintiff further claims that "[s]uch intentional misrepresentation was undertaken for the purpose of reducing Defendant's cost and constitutes a breach of the covenant of good faith and fair dealing." (Compl. ¶¶ 34-37). To the extent Count II is based on Cubic's alleged misrepresentation or failure to disclose information to the MBTA, as detailed above there is no record support for this contention. Moreover, this claim is nullified by the fact that Cubic obtained the MBTA's express approval to replace ACA with an alternative DBE subcontractor. (See DF ¶ 22; Def. Ex. D). Perhaps even more significantly, however, ACA's ability to prevail on its claim for breach of the implied covenant of good faith and fair dealing is dependent upon a showing that it was an intended third-party beneficiary under the Contract between Cubic and the MBTA. Because the plaintiff cannot make such a showing, Cubic is entitled to summary judgment with respect to this claim as well.

"'Every contract implies good faith and fair dealing between the parties to it.'" T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 569-70, 924 N.E.2d 696, 703 (2010) (quoting Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471, 583 N.E.2d 806 (1991) (additional citation omitted). "The covenant of good faith and fair dealing requires that 'neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract.'" Id. at 570, 924 N.E.2d at 704 (quoting Anthony's Pier Four, Inc., 411 Mass. at 471-72, 583 N.E.2d 806)

(additional citation omitted). However, as the Massachusetts Supreme Judicial Court has explained,

> the scope of the covenant is only as broad as the contract that governs the particular relationship. It cannot create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.

Id. (internal quotations and citations omitted).

As Massachusetts law defining the implied covenant illustrates, the duty of good faith and fair dealing arises out of the relationship between parties to a contract, and "is shaped in each context by the nature of the contractual relationship." Id. at 573, 924 N.E.2d at 706. Where, as here, the plaintiff was not a party to the contract at issue, and cannot prove that it was an intended third-party beneficiary under that contract, it cannot recover for breach of the implied covenant of good faith and fair dealing. See Rymes Heating Oils, 265 F. Supp. 2d at 151 (no implied contractual duty of good faith and fair dealing is owed to a non-party to a contract unless it is a third-party beneficiary under the contract). Therefore, Cubic's motion for summary judgment will be allowed with respect to Count II.

## IV. CONCLUSION

For all the reasons detailed herein, this court finds that ACA was not an intended beneficiary under the Contract between the defendant and the MBTA, and that therefore, its claims for breach of contract and breach of the implied covenant of good faith and fair

dealing must fail. Accordingly, the "Defendant Cubic Transportation Systems, Inc.'s Motion for Summary Judgment" (Docket No. 17) is ALLOWED.

                                         / s / Judith Gail Dein
                                         Judith Gail Dein
                                         United States Magistrate Judge